IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

NO. 23-13121
_____

UNITED STATES OF AMERICA,

Appellee,

Versus

ALHAJI TOURAY,

Defendant-Appellant.
_____

A DIRECT APPEAL OF A CRIMINAL CONVICTION
FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
_____

INITIAL BRIEF

SYDNEY R. STRICKLAND
Georgia Bar Number: 418591
Strickland Webster, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
404-590-7967
Attorney for Appellant Touray

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

versus                                        APPEAL NO. 23-13121-D

ALHAJI TOURAY,

　　　　Defendant - Appellant.
_____/

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT

Counsel hereby certifies that the following may have an interest in

the outcome of this appeal:

Baverman, Honorable Alan J. - United States Magistrate Judge,

Northern District of Georgia;

Buchanan, Ryan K. – United States Attorney, Northern District of

Georgia;

Calvert, Victoria Marie – former Counsel for Co-Defendant Njie;

Dace, Niaja –  Co-Defendant;

Dawson, Allison Cobham – Counsel for Co-Defendant Njie;

Elwart, Kathryn – Counsel for Co-Defendant B.Touray;

Hodges, Lawanda N. – Counsel for Co-Defendant Kamateh;

Howard, Zachary S. - Assistant United States Attorney, Northern District of Georgia;

Joy, Nicholas N. – Assistant United States Attorney, Northern District of Georgia;

Kamateh, Muhamadou – Co-Defendant;

Kish, Paul Stephen – Counsel for Co-Defendant Dace;

Njie, Alhagi Kebba – Co-Defendant;

Repasky, Alexander Joseph – Counsel for Co-Defendant K.Touray;

Ross, Michael Tyler – Counsel for Co-Defendant B.Touray;

Salinas, Honorable Catherine M. - United States Magistrate Judge, Northern District of Georgia;

Saul, Michael H. – Lead Counsel for Co-Defendant B.Touray;

Strickland, Sydney – Counsel for Defendant/Appellant Alhaji Touray;

Thomas, Jr., William H. – former Counsel for Defendant/ Appellant;

Thrash, Honorable Thomas W. – United States District Judge, Northern District of Georgia;

Touray, Alhaji Jewru – Defendant/ Appellant;

Touray, Bangally – Co-Defendant;

Touray, Karamo – Co-Defendant;

Walker, Honorable Linda T. – United States Magistrate Judge,

Northern District of Georgia;

Wallace, Michael B. – former Counsel for Defendant/ Appellant;

Wheeler, Takiya J. – Counsel for Co-Defendant Njie;

No publicly-traded company or corporation has an interest in the outcome of this appeal or case.

Dated this 5th day of February, 2024.

/s/ *Sydney Strickland*
Sydney Strickland
Georgia Bar No. 418591
Attorney for Alhaji Touray

Strickland Webster, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
(404) 590-7967
sydney@stricklandwebster.com

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 34(a), F.R.A.P., the Defendant-Appellant requests oral argument because it would significantly aid in the decisional process.

## STATEMENT OF TYPE SIZE AND STYLE

Pursuant to 11th Cir. R. 28-2 (d), counsel for Appellant hereby certifies that the size and style of type used in this brief is Book Antiqua 14 PT.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................C1-3

STATEMENT REGARDING ORAL ARGUMENT............................................i

STATEMENT OF TYPE SIZE AND STYLE.....................................................ii

TABLE OF CONTENTS.................................................................................iii

TABLE OF AUTHORITIES ............................................................................v

STATEMENT OF JURISDICTION.................................................................ix

STATEMENT OF THE ISSUES ......................................................................1

STATEMENT OF THE CASE..........................................................................2

   I.   Course of Proceedings ...................................................................2

   II.  Statement of the Facts ....................................................................3
      a.  Jury Selection........................................................................3
      b.  Trial .......................................................................................4
      c.  Sentencing...........................................................................17

STANDARDS OF REVIEW ...........................................................................22

SUMMARY OF THE ARGUMENT ................................................................23

ARGUMENT AND CITATIONS OF AUTHORITY .......................................25

   I.   The district court's unjustified use of an anonymous jury violated Mr.
   Touray's constitutional right to a presumption of innocence. .................25

   II.  The district court erred by refusing to give Mr. Touray's multiple
   conspiracies instruction because there was at least slight evidence
   supporting the defense theory that instead of the single charged
   conspiracy, more than conspiracy existed....................................................31

   III.  The district court violated Mr. Touray's Fifth and Sixth Amendment
   rights when it based the drug quantity calculations on acquitted
   conduct..........................................................................................................36

   IV.   The district erred by court imposing a sentence on Count 2 that was
   substantively unreasonable and procedurally erred by failing to
   adequately explain its chosen sentence. .......................................................42

CONCLUSION ..............................................................................................48

CERTIFICATE OF COMPLIANCE ................................................... 49

CERTIFICATE OF SERVICE ......................................................... 50

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Coffin v. United States*, 156 U.S. 432, 453 (1895); ............................................. 25

*Estelle v. Williams*, 425 U.S. 501, 503 (1976) ..................................................... 25

*Gall v. United States*, 552 U.S. 38, 50 (2007) ....................................22,43, 44, 45

*Jones v. United States*, 547 U.S. 948 (2014) ......................................................... 37

*Martel v. Clair*, 565 U.S. 648, 663 (2012) ............................................................. 29

*Rehaif v. United States*, 588 U.S. ----, 139 S. Ct. 2191, 2195–97 (2019) ........... 32

*Rita v. United States*, 551 U.S. 338, 356 (2007) ................................................... 46

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) ........................... 31

## CIRCUIT COURT CASES

*United States v Canania*, 532 F.3d 764, 777 (8th Cir. 2008) .............................. 40

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) .................................... 38, 39

*United States v. Bowman*, 302 F.3d 1228, 1238–39 (11th Cir. 2002) ........... 26, 28

*United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997) ..................... 22

*United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006) ........................... 39

*United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001). .......22, 32, 34, 35

*United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008) ..................... 43

*United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) .............................. 43

*United States v. Krout*, 66 F.3d 1420, 1427 & n. 7 (5th Cir. 1995) ................... 27

*United States v. LaFond*, 783 F.3d 1216, 1223 (11th Cir. 2015) ........................ 28

*United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011)........................... 29

*United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) ............................ 39

*United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1034 (11th Cir. 2005) ..... passim

*United States v. Palma*, 511 F.3d 1311, 1315 (11th Cir. 2008).................... 32, 34

*United States v. Parks*, 823 F.3d 990, 996 (11th Cir. 2016)......................... 22, 44

*United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) ........................... 43

*United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008) .................. 33

*United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994) ..22, 25, 26, 28, 29, 30

*United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) ........... 37

*United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir. 2016)............................... 30

*United States v. Williams*, 527 F.3d 1235, 1239 (11th Cir. 2008) ..................... 22

*United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir. 1984) ..................... 32

## OTHER CASES

*People v. Beck*, 504 Mich. 605 (2019) .................................................... 39

## STATUTES

18 U.S.C. § 1326................................................................................ 2

18 U.S.C. § 1956................................................................................ 2

18 U.S.C. § 2 ............................................................................................. 2

18 U.S.C. § 3553.............................................................................22, 42, 43, 45

18 U.S.C. § 3553(a) ........................................................................42, 43, 45

18 U.S.C. § 924 ......................................................................................... 2

21 U.S.C. § 841 ......................................................................................... 2

28 U.S.C. § 1291....................................................................................... ix

28 U.S.C. § 1863...................................................................................25, 29

SENTENCING GUIDELINES

U.S.S.G. § 2D1.1 ................................................................................. 17, 41

U.S.S.G. § 2L1.2(a) ............................................................................... 17

U.S.S.G. § 3C1.1 ................................................................................... 18

U.S.S.G. § 3D1.1(d) .............................................................................. 17

U.S.S.G. § 3D1.5 ................................................................................... 44

U.S.S.G. Amendment 821 ....................................................................... 47

U.S.S.G. Amendments 706 and 713 ........................................................ 47

RULES

11th Cir. R. 28-2 (d).............................................................................. ii

Fed.R.App.P. 32(a)(7)(B)(iii) ................................................................ 49

Federal Rule of Appellate Procedure 4 ............................................................. ix

Rule 34(a), F.R.A.P. .................................................................................... i

<u>STATEMENT OF JURISDICTION</u>

The Eleventh Circuit Court of Appeals has jurisdiction to consider this case pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4. This case involves a direct appeal of a sentence imposed in the United States District Court for the Northern District of Georgia, Atlanta Division.

## STATEMENT OF THE ISSUES

1. The district court's unjustified use of an anonymous jury violated Mr. Touray's constitutional right to a presumption of innocence.

2. The district court erred by refusing to give Mr. Touray's multiple conspiracies instruction because there was at least slight evidence supporting the defense theory that instead of the single charged conspiracy, more than conspiracy existed.

3. The district court violated Mr. Touray's Fifth and Sixth Amendment rights when it based the drug quantity calculations on acquitted conduct.

4. The district erred by court imposing a sentence on Count 2 that was substantively unreasonable and procedurally erred by failing to adequately explain its chosen sentence.

## STATEMENT OF THE CASE

### I. Course of Proceedings

In February 2020, Alhaji Jewru Touray was indicted on charges of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956, and illegal reentry, in violation of 18 U.S.C. § 1326. (Doc. 4). A superseding indictment was filed in August 2020, and a second superseding indictment was filed in May 2023. (Docs. 38, 290).

The second superseding indictment charged Mr. Touray with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) (Count 1); illegal reentry, in violation of 18 U.S.C. § 1326(a) and (b)(1) (Count 2); conspiracy to possess with intent to distribute 100 kilograms or more of a mixture and substance containing marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846 (Count 3); two counts of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Counts 4 and 6); and one count of possession with intent to distribute a mixture and substance containing marijuana, in violation of 21 U.S.C. § 841(a)and (b)(1)(C), and 18 U.S.C. § 2 (Count 5). (Doc. 290). Codefendants Niaja Dace and Bangally Touray were also charged in

Count 1, which alleged that they conspired with unindicted co-conspirators, including Muhamadou Kamateh and Karamo Touray.

Mr. Touray entered a non-negotiated guilty plea to Count 2, illegal reentry, on May 10, 2023. (Doc. 311). He proceeded to trial on the remaining counts, along with codefendant Bangally Touray. He was found guilty on Count 3—but for less than 100 kilograms—and Count 5, and not guilty on Counts 1, 4, and 6. Mr. Touray was sentenced to 120 months' imprisonment on each of Counts 2, 3, and 5, to run concurrently. (Doc. 376). He timely filed a notice of appeal. (Doc. 380).

II.    Statement of the Facts

   a.  Jury Selection

Prior to trial, the parties were informed that an anonymous jury would be empaneled, although neither party requested an anonymous jury. (Doc. 404 at 13). The court informed the parties that an anonymous jury would be used because "in cases involving drugs and money laundering, that's a sufficient matter of concern to the public to justify me using an anonymous jury." (*Id.*). Mr. Touray objected to that procedure. (*Id.*).

For jury selection, venire members were listed by number only, without names or "any other identifying information." (Doc. 406 at 8). Mr.

Touray renewed his objection to the anonymous jury at the conclusion of jury selection. (Doc. 406 at 171-72). At that point, the court explained that:

> One, I typically do pick an anonymous jury when the allegations of the Indictment are that there's any sort of organized criminal activity where the jurors might think that if the allegations are true, that there might be other unindicted or other co-conspirators who might be in a position to contact them if their identities were known.
>
> And I also pick anonymous juries in any case involving weapons charges, where the jurors might think there might be some threat to their personal safety.
>
> And both of those circumstances are here and that's why I'm selecting an anonymous jury.

(*Id.* at 171).

### b. Trial

#### i. *Confidential Informant*

At trial, the government first called Special Agent Arthur Morrison of Homeland Security Investigations ("HSI"). (Doc. 407 at 26). SA Morrison was brought into this investigation by SA Matt Devane to assist with coordinating a confidential informant ("CI"). (*Id.* at 27-28). The CI communicated with Mr. Touray on a cell phone, and some of their conversations were in the Mandinka language. (*Id.* at 28-29).

Modou Sidibe was the CI that SA Morrison worked with on this case. Sidibe was involved in drug trafficking starting in the 1990s and continuing until he was arrested in 2018; he primarily bought and sold cocaine. (Doc. 407 at 141). Upon his arrest, he agreed to cooperate with the government and received a sentence of probation rather than prison. (*Id.*). As part of his cooperation, on February 9 and 10, 2020, Sidibe called his friend, Agie Ruggie Jallow, and asked her to get him into contact with Mr. Touray. (*Id.* at 142). The calls with Mr. Touray and Jallow were recorded and entered into evidence as Government's Exhibit 14A. (*Id.* at 143).[1]

Sidibe testified that he and Mr. Touray arranged for Sidibe to purchase marijuana, and the price would be $1,750. (*Id.* at 150). Sidibe was supposed to go to Atlanta for the transaction, but Mr. Touray would not be there. (*Id.* at 152; doc. 342-14 at 7). Instead, Mr. Touray said he would give Sidibe the information he needed to get the marijuana from someone else when he arrived in Atlanta. (Doc. 407 at 152). Sidibe testified that, after the recorded conversations, Mr. Touray put him in touch with a different person who told

_____

[1] Transcripts of the calls were entered into evidence as Government's Exhibit T1-T9. (Doc. 407 at 144-45). Ousmane Cisse translated the portions of the conversations that were in Mandinka, a West African language mainly spoken in Senegal and The Gambia, and Wolof, a language mostly spoken in Senegal. (*Id.* at 121-26).

him where to go to complete the transaction. (*Id.* at 159). Sidibe never intended to actually complete the transaction. (*Id.* at 155-56).

### ii. *Atlanta Search Warrant*

SA Morrison obtained a search warrant for a residence of 7541 Hilltop Way in Atlanta, and participated in the execution of the warrant on February 11, 2020. (Doc. 407 at 29-30, 33). Two people were in the home when officers arrived, Alhagi Kebba Nijie and Mohammed Bojang. (*Id.* at 31, 87). In the house, Morrison saw large packages of what appeared to be marijuana, a money counter, and what he identified as a drug ledger. (*Id.* at 32). Boxes that Morrison described as "shipping packages" were found in the garage. (*Id.* at 38). Some had packages of marijuana inside. (*Id.*). In all, approximately 55 kilograms of marijuana[2] and approximately \$30,000 in cash were found in the home. (*Id.* at 54). A handgun was found in the residence as well. (*Id.* at 42-43).

Agents also found an envelope with Mr. Touray's name and two passports with his name. (*Id.* at 39-42). However, the mail was dated several years prior, and the credit cards had also expired years before the search.

---

[2] Kelly Russell, a chemist for U.S. Customs and Border Protection, testified that a sample she tested in her lab was positive for marijuana. (Doc. 351 at 6-7, 10, 12).

(*Id.* at 97-100). The passports had expired in March of 2016 and May of 2018, approximately two and four years before the February 2020 search. (*Id.* at 99). No documents found in the residence related to Mr. Touray were dated close in time to the execution of the search warrant. (*Id.* at 101). Morrison further testified that agents conducted surveillance on the home the morning of the search warrant execution, beginning at around 6 a.m., and Mr. Touray was not seen. (*Id.* at 79, 85).

### iii.    *California Search Warrant*

F.B.I. Special Agent Brandon Hamburg of the San Francisco field division testified that the Atlanta division of the F.B.I. asked him to do a "trash cover" at 1354 Spring Hill Drive in Pittsburgh, California. (Doc. 351 at 20-21). Agent Hamburg searched the trash taken from outside that residence on February 5, 2020. (*Id.* at 22). He found, *inter alia*, an invoice related to Niaja Dace and a letter with her name on it, foam sealant cans, glue, vacuum seal bags, small plastic bags with suspected marijuana residue, and a receipt with the name Touray. (*Id.* at 23-27).

F.B.I. Special Agent Robert Matthews testified that he was the "seizing agent" during the execution of a search warrant of the California house (Doc. 351 at 34-36). Mr. Touray and another individual named Bangally Touray—

but not the Bangally Touray who was a codefendant at trial—were at the home. (*Id.* at 37, 47-48, 84). The other Bangally Touray ("California Bangally") jumped out of a window and ran from law enforcement. (*Id.* 73). Inside the home, agents found boxes and shipping tubes, drugs inside a box, a money counter, a Republic of Gambia passport with the name Jewru Touray, and a Georgia driver's license with the name Jewru Touray and a Hilltop Way address. (*Id.* at 41, 45, 46-48). One gun found in the living room, and two more were found in a bedroom that also contained a bag with drugs in it. (*Id.* at 41-46). The total weight of the marijuana in the home was approximately seven pounds. (*Id.* at 50).

Special Agent Matthew DeVane testified that he worked for HSI from 2008 to 2021. (Doc. 351 at 184). He was part of the search team of the California house. (Doc. 408 at 23-24). When he entered the home, he used his cell phone to call the number that Sidibe had been communicating with about the marijuana transaction, and a phone inside the house rang. (*Id.* at 25). DeVane testified that there were materials in the California house that appeared to be used to make the shipping boxes found in the Atlanta house. (*Id.* at 35, 39-40).

DeVane interviewed Mr. Touray in the home. (408 at 27). Mr. Touray told him he ran a marijuana business in California because it was legal there. (Doc. 351 at 30; Doc. 408 at 90). He said he was going to sell the CI marijuana in Atlanta, and said he "claimed[ed] for" the marijuana in the Atlanta house. (Doc. 408 at 36-37). Mr. Touray also told DeVane that he ran two gas stations in Atlanta called 2Ray's Mart and Empire Services Mart. (*Id.* at 30-31). He also had an import-export business called Rue Investments. (*Id.* at 96). Finally, Mr. Touray provided a combination that agents in Atlanta were able to use to open a safe at the Atlanta house. (*Id.* at 31). The safe was empty. (Doc. 407 at 79).

### iv.    *Flights and Cash Seizures*

Prior to the search and Mr. Touray's arrest, Devane was investigating Mr. Touray and learned that he was booked to take a flight from Atlanta to San Francisco on December 12, 2018. (Doc. 351 at 187-88). He obtained a search warrant for Mr. Touray's bags, and found $73,975 in cash hidden within the clothing in the bag. (*Id.* at 189-92). DeVane conducted another seizure, this time from codefendant Niaja Dace for a flight from Atlanta to Reno, on January 25, 2019. (*Id.* at 192). Dace's bag contained $48,770 in cash.

(*Id.* at 195). She did not board the flight. (*Id.*). On March 26, 2019, $66,060 was seized from Bangally on a flight from Atlanta to Reno. (*Id.* at 201-04).

In May 2019, Bangally was scheduled to take a flight out of the United States, and DeVane requested to have a border search conducted. (Doc. 351 at 218-19). DeVane searched Bangally's cell phone. (*Id.* at 219). It contained contact called Ja3 with the phone number associated with Mr. Touray. (*Id.* at 222; Doc. 408 at 45). There was a message between Bangally and that number with Bangally's birth date, a message saying "I'm on board" on February 23, 2019, a message saying "call Niaja," and a message with the address of the house in Pittsburgh, California. (Doc. 408 at 12-14, 16-187). There were also records showing that Mr. Touray had purchased some flights for Bangally. (Doc. 351 at 20).

The phone also contained messages with others about small quantities of marijuana. (Doc 408 at 8). Bangally was interviewed after his arrest in September 2020. (*Id.* at 9-10). Bangally said that when he was stopped with $66,000, the cash was actually for someone else and not for gambling. (*Id.* at 10). He had transported cash to California on at least two other occasions; carrying $18,000 on one trip and $30,000 on another. (*Id.* at 10-11).

Federal Air Marshall Jason McLeod testified that he was assigned to surveillance of Dace on a flight from Denver to Reno on January 25, 2019, but Dace was not on the flight. (Doc. 351 at 86-87). However, he did see Mr. Touray at the Reno baggage claim where the bags from the Reno flight were arriving. (*Id.* at 88-89).

Darnell Perry, Atlanta police department and DEA taskforce officer testified that, on March 26, 2019, he was part of an airport interdiction unit and was asked to look for Bangally Touray. (Doc. 351 at 90-93). Bangally was flying from Atlanta to Reno. (*Id.* at 94). Perry intercepted him before he boarded the flight, and Bangally said that he was going to Reno to gamble. (*Id.* at 96). Bangally told officers that he had $60,000 in his bag, and the money was given to him by family members, who earned it from flea market sales. (*Id.* at 97-98). Later in the interview, he said $40,000 was from flea market sales and $20,000 was borrowed. (*Id.* at 100). The officers seized Mr. Bangally's bag and money. (*Id.* at 100-01).

U.S. Customs and Border Protection officer John Costanza testified that he conducted an outbound border search of Bangally Touray on May 12, 2019. (Doc. 407 at 131-33). Costanza found approximately $14,000 in cash during the search. (*Id.* at 134).

Agent Bryan Haley of HSI testified that he arrested Bangally at an apartment in Atlanta on September 9, 2020. (Doc. 351 at 114-117). Bangally consented to a search of the apartment, and agents recovered a package of marijuana in his bedroom closet along with a scale and ziplock bags. (*Id.* at 119, 122-23).

v.     *Reno UPS Store*

Jennifer Debenham testified that she manages the UPS store at 1058 North McCarran Boulevard in Reno, Nevada. (Doc. 351 at 145). On April 1, 2019, Dace opened a mailbox at that store. (*Id.* at 146-47). Debenham never saw Dace again, but a black male in his 30s or 40s picked up packages addressed to Bay Designs from that mailbox. (*Id.* at 147). Approximately 40 packages were delivered to the box between April and October of 2019. (*Id.* at 148). In October, 2019, law enforcement officers seized two packages bound for the mailbox. (*Id.* at 148).

Deputy Joseph Teixeira of the Washoe County Sheriff's Office in Nevada testified that he previously worked for the State Highway Patrol on the drug trafficking task force. (Doc. 351 at 152-53). In that capacity, he stopped Karamo Touray on September 26, 2019. (*Id.* at 154-55). In the car driven by Karamo Touray, Teixeira found a letter from a UPS store stating

that Dace's mailbox was about to expire, and a receipt from a dental office with Mr. Touray's name on it. (*Id.* at 159). He did not find any controlled substances or cash. (*Id.* at 159-60).

> ### vi. *Defense Case*

Mr. Touray testified in his own defense. Mr. Touray is from the Republic of Gambia. (Doc. 408 at 160). He lived in Georgia from 1999 to 2013, when he moved to California. (*Id.*). He testified that he was introduced to Sidibe by Agie Ruggie Jallow in 2016; she told Mr. Touray that Sidibe was a former schoolmate who was visiting Atlanta. (*Id.* at 162-63). Mr. Touray met with Sidibe for only about an hour, and did not discuss drugs with him. (*Id.* at 163). Then in November 2019, Jallow called Mr. Touray and told him that she and Sidibe were engaged. (*Id.* at 163). Sidibe later asked Mr. Touray to get him into contact with someone who could sell him marijuana, and Mr. Touray told him he would try to help. (*Id.* at 164-65). He later agreed to sell Sidibe marijuana in Atlanta. (Doc. 409 at 35).

Sidibe contacted Mr. Touray again in February of 2020 and told him he was in Atlanta but had no money for a hotel. (Doc. 408 at 165). Mr. Touray told him he could stay at the house where some of his family members resided—the Atlanta house. (*Id.* at 165-66). Mr. Touray described the house

a "a family house" that had "a bunch of people" living in it at any giving time, including his nephews, cousins, and family friends. (*Id.* at 166). Mr. Touray came from a very large family and many family members looked to him for support. (*Id.* at 167). Mr. Touray went to the house himself only rarely. (*Id.* at 166).

Mr. Touray testified that he had nothing to do with the marijuana in the Atlanta house. (*Id.* at 170). When he told DeVane that he "claim[ed] for it," he thought that it was only three or four pounds, and he wanted to protect his family members who lived in the home. (Doc. 409 at 6). He would not have tried to falsely take responsibility for it if he "knew that much marijuana was in the house." (*Id.* at 7).

Mr. Touray further testified that the marijuana in the Pittsburgh, California house was not his. (Doc. 408 at 175). However, he did sell marijuana in California at times. (*Id.* at 175-76). He testified that two of the guns in the house were in Bangally's room. (*Id.* at 176). The gun under the sofa was given to him by a friend after someone tried to break into his house. (*Id.* at 177).

Mr. Touray gave someone cash to take onto an airplane on one occasion. (Doc. 409 at 7). In 2017, he gave Buba Drammeh $15-20,000 to bring

14

to him; the money was generated from the gas stations he owned in Atlanta. (*Id.* at 7). He could not have the money deposited because he didn't have an ID to withdraw money at the time. (*Id.*). The money was to pay a lawyer for a foreclosure issue. (*Id.* at 8). The money that was taken from his own suitcases in 2018 was also cash from the gas station. (*Id.* at 8-9). The cash station generated around $18,000 daily in cash sales from the lottery. (*Id.* at 9).

### vii. *Charge Conference*

After both parties rested, the court took up the jury charges. (Doc. 409 at 44-45). The night before, Mr. Touray filed a request for a theory of defense instruction "with respect to multiple conspiracies." (*Id.* at 60). That full instruction provided:

> As I have already instructed you, the government has the burden to prove the defendant's guilt beyond a reasonable doubt. I will now instruct you on Mr. Touray's fundamental theory of the case.
>
> With respect to Count 1 of the indictment, Mr. Touray contends that the mere concealment of proceeds of a specified unlawful activity is insufficient to establish the crime of money laundering.
>
> With respect to Count 3 of the indictment, Mr. Touray contends that the evidence presented at trial establishes that there were multiple conspiracies. Proof of several separate conspiracies isn't proof of the single, overall conspiracy charged in the indictment

unless one of the several conspiracies proved is the single overall conspiracy. You must decide whether the single overall conspiracy charged existed between two or more conspirators. If not, then you must find the Defendants not guilty of that charge. But if you decide that a single overall conspiracy did exist, then you must decide who the conspirators were. And if you decide that a particular Defendant was a member of some other conspiracy – not the one charged – then you must find that Defendant not guilty. So, to find a Defendant guilty, you must all agree that the Defendant was a member of the conspiracy charged – not a member of some other separate conspiracy.[3]

(Doc. 329 at 2-3).

The government objected to the charge, arguing that it was covered by other charges that were already being given, and that the "language with respect to the conspiracy could be confusing." (Doc. 409 at 64). Mr. Touray argued that there was no specific language with regard to multiple conspiracies, and his defense with respect to the drug counts was that there were multiple conspiracies involved. (*Id.* at 64-65). Specifically, Mr. Touray had testified to selling marijuana in California but denied being part of "the overarching conspiracy as alleged by the Government." (*Id.* at 65). The court refused to give the instruction, finding that it was "confusing" and was not "adjusted to the evidence." (*Id.* at 65-66).

---

[3] The portion of this instruction on multiple conspiracies is this Circuit's pattern instruction. *See* 11th Cir. Pattern Jury Instructions O13.3.

Mr. Touray was found guilty on Count 3— but involving less than 100 kilograms— and Count 5, and not guilty on Counts 1, 4, and 6. (Doc. 334). Codefendant Bangally Touray was acquitted of both counts against him. (*Id.*).

### c. Sentencing

The probation officer prepared a presentence investigation report ("PSR"). Because the jury found that Mr. Touray was responsible for less than 100 kilograms on Count 3, he was not subject to a mandatory minimum term of imprisonment. (PSR at 2). For the guidelines, Counts 3 and 5 were grouped pursuant to U.S.S.G. § 3D1.1(d) ("Group 2"), but Count 2 (illegal reentry) formed its own group. ("Group 1"). (PSR at ¶ 168-69).

For Group 1, the base offense level was 8, pursuant to U.S.S.G. § 2L1.2(a). (PSR at ¶ 170). There were no specific offense characteristics applied, such that the adjusted offense level remained 8. (PSR at ¶ 175).

For Group 2, the PSR held Mr. Touray responsible for 688.69 kilograms of marijuana, which yielded a base offense level of 26 pursuant to U.S.S.G. § 2D1.1. (PSR at ¶ 26). Two levels were added pursuant to § 2D1.1(b)(1) because firearms were seized at both the Atlanta house and the California house. (PSR at ¶ 177). Pursuant to § 2D1.1(b)(12), two levels were added for

maintaining stash houses. (PSR at ¶ 178). Another four levels were added for role in the offense, as the PSR found that he was the leader or organizer of criminal activity involving five or more participants or that was otherwise extensive. (PSR at ¶ 180). A three-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice, based on an allegation that he instructed Dace to "contact/threaten witnesses" and transfer assets, and also on his testimony at trial. (PSR at ¶ 181). This yielded an adjusted offense level of 36. (PSR at ¶ 182).

No units were added to the highest group total because the offense level for Group 1 was more than 9 levels less serious than Group 2. (PSR at ¶¶ 183-186). Accordingly, the combined adjusted offense level was 36. (PSR at ¶ 186). Mr. Touray's criminal history score was zero and a category I. (PSR at ¶¶ 196-97). This yielded a guideline sentencing range of 188 to 235 months. (PSR at 54).

Mr. Touray objected to, *inter alia*, the drug quantity in paragraph 176, the two-level enhancement for the firearms, the four-level role enhancement, and the enhancement for obstruction of justice, but only to the extent that it relied on Mr. Touray's trial testimony. (PSR at 58).

At the sentencing hearing, the court took up the drug quantity first. (Doc. 410 at 5). The government called SA DeVane to testify regarding the drug quantity. He first testified about a seizure from Bubacarr Drammeh and his subsequent interview. (Doc. 410 at 11-17). However, later in the hearing, Mr. Touray sought to introduce an interview of Drammeh that he contended would be in conflict with DeVane's testimony and also show that the information from Drammeh was unreliable. (*Id.* at 62). After a break the government informed the court that it did not intend to rely on information from or about Drammeh, and Mr. Touray agreed that it was not necessary to play the interview. (*Id.* at 68).

DeVane went on to testify about cash seizures testified to at trial, as well as evidence regarding the UPS store in Reno. (*Id.* at 17-36). Finally, DeVane testified about the searches of the Atlanta house and the California house, although he was only present at the California search. (*Id.* at 37-44). Approximately 4.8 kilograms of marijuana were seized in California, and approximately 54.83 kilograms were seized in Atlanta. (*Id.* at 43-44).

The government argued that the drug quantity should be based on the total amount of seized currency in conjunction with the $1,750 per pound price that Mr. Touray gave to Mr. Sidibe, plus the quantities of drugs seized

from both houses. (Doc. 410 at 69-70). This corresponded with lines 6 through 15 of the chart in paragraph 159 of the PSR. (*Id.* at 70). The total drug quantity based on this calculation was 190.22 kilograms of marijuana. (*Id.* at 71).

The court found that the government had shown by a preponderance of the evidence and by specific and reliable evidence that Mr. Touray's relevant conduct included at least 190 kilograms of marijuana. (*Id.* at 81). The court stated that the evidence at trial led it to believe that Mr. Touray was "a large-scale trafficker in marijuana." (*Id.*). The court hypothesized that the jury acquitted Mr. Touray on the money laundering counts because they "thought just having cash on your person doesn't constitute a transaction." (*Id.* at 82). The court also noted that the jury had rejected the government's argument that they could base their drug quantity on the amount of seized cash, cash intercepted in the mail, and cash at the Atlanta stash house, but the court did accept that theory for sentencing. (*Id.* at 82).

This drug quantity resulted in a base offense level of 24. (Doc. 410 at 82). The court overruled Mr. Touray's remaining objections to the sentencing enhancements. (*Id.* at 85-89). The court then announced the final sentencing guideline calculations. (*Id.* at 96-97). For Group 1, the illegal

reentry conviction, the adjusted offense level was 8. (*Id.* at 96). For Group 2, the base offense level was 24 and there were 10 levels added for specific offense characteristics and role. (*Id.* at 96-97). Therefore, the adjusted offense level for Group 2 was 34. (*Id.* at 97). The grouping rules did not result in any increase. (*Id.*). Accordingly, the combined adjusted offense level was 34. (*Id.*). With a criminal history category of I, the guideline range was 151 to 188 months. (*Id.* at 97, 100).

The government recommended a sentence of 188 months, while Mr. Touray argued for a sentence of time served. (*Id.* at 101, 109). The court sentenced him to 120 months as to each count, all to run concurrently. (*Id.* at 110). The court stated that the sentence was based on its belief that the guideline range "overstate[d] the Defendant's criminal responsibility." (*Id.* at 112). The court also noted that the sentence was crafted to avoid an unwarranted disparity between the sentences of Mr. Touray and his co-conspirators and codefendants. (*Id.* at 113). Mr. Touray told the court he wished to preserve his previous arguments and also objected to the reasonableness of the sentence. (*Id.* at 115).

## STANDARDS OF REVIEW

A district court's decision to empanel an anonymous jury is reviewed for an abuse of discretion. *United States v. Ross,* 33 F.3d 1507, 1519 (11th Cir. 1994).

This Court reviews a district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Fulford,* 267 F.3d 1241, 1245 (11th Cir. 2001). However, the specific issue of whether there was sufficient evidence to warrant a particular jury instruction such as a multiple conspiracy instruction, is a question of law subject to de novo review. *United States v. Calderon,* 127 F.3d 1314, 1329 (11th Cir. 1997).

Claims of constitutional error are reviewed de novo. *United States v. Williams,* 527 F.3d 1235, 1239 (11th Cir. 2008). The reasonableness of a sentence is reviewed for abuse of discretion. *Gall v. United States,* 552 U.S. 38, 51 (2007). This Court reviews de novo a claim that the district court did not adequately explain its findings under 18 U.S.C. § 3553(c)(2). *United States v. Parks,* 823 F.3d 990, 996 (11th Cir. 2016).

## SUMMARY OF THE ARGUMENT

The district court's unjustified use of an anonymous jury violated Mr. Touray's constitutional right to a presumption of innocence because it led the jury to believe that he was a dangerous person and they needed the protection of anonymity. The district court's reasoning for empaneling an anonymous jury in this case applies to almost every drug conspiracy case that goes to trial. This flies in the face of this Court's precedent holding that the "drastic measure" of an anonymous jury should be used only "in limited and carefully delineated circumstances." This burden on Mr. Touray's constitutional rights requires reversal.

The district court further erred in refusing to instruct the jury on multiple conspiracies. Mr. Touray's defense was that there were multiple conspiracies and not one overarching conspiracy, as the government alleged. There was evidence supporting the theory, the instruction was an accurate statement of the law that was not covered by other instructions, and the failure to give the instruction impaired Mr. Touray's defense, as demonstrated by the jury's verdict that rejected the drug quantity that would have applied had it accepted the government's theory. As such, his trial convictions must be vacated.

The use of acquitted conduct—specifically, a drug quantity of more than 100 kilograms when the jury found Mr. Touray guily of less than 100 kilograms—violated Mr. Touray's Fifth and Sixth Amendment rights. Therefore, this Court must vacate his sentences and remand for resentencing consistent with the jury's verdict.

Finally, the district court imposed a procedurally and substantively unreasonable sentence on Count 2, the illegal reentry conviction. The sentence of 120 months was the statutory maximum sentence, while the guidelines that applied to that count specifically were 0 to 6 months. The court gave no justification for this sentence on Count 2 and simply gave Mr. Touray the same concurrent sentence on all counts. Therefore, his sentence on Count 2 must be vacated and he must be resentenced on that Count.

## ARGUMENT AND CITATIONS OF AUTHORITY

I. **The district court's unjustified use of an anonymous jury violated Mr. Touray's constitutional right to a presumption of innocence.**

Under 28 U.S.C. § 1863(b)(7), a district court may empanel an anonymous jury in any case in which "the interests of justice so require." This Court "has recognized that the use of an anonymous jury is a 'drastic measure' that implicates the defendant's constitutional right to a presumption of innocence by 'rais[ing] the specter that the defendant is a dangerous person from whom the jurors must be protected'" *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1034 (11th Cir. 2005) (quoting *United States v. Ross,* 33 F.3d 1507, 1519 (11th Cir. 1994)).

The presumption of innocence is "undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."). Because empaneling an anonymous jury implicates this constitutional right, a court should only use such a procedure "in limited and carefully delineated circumstances." *Ross,* 33 F.3d at 1519.

"In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is a strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *Ross*, 33 F.3d at 1520 (citation and internal quotation marks omitted). This Court has explained that some of the following factors may support the empanelment of an anonymous jury:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*Id*.

Applying these factors, this Court has held that an anonymous jury may be justified even when the defendant has not attempted to interfere with the current proceedings, if he belongs to a group that has a history of interfering with other judicial proceedings. *See Ochoa-Vasquez*, 428 F.3d at 1034-35 (specific evidence linked the defendant "to an organized criminal organization with a history of violence and obstruction of justice"); *United States v. Bowman*, 302 F.3d 1228, 1238–39 (11th Cir. 2002) (upholding use of

26

anonymous jury when defendant was the leader of a motorcycle gang with history of violence and witness intimidation). Similarly, the Fifth Circuit has held that although mere allegations or inferences of potential risk are an insufficient basis for an anonymous jury, "[a] lesser showing might be adequate where specific evidence exists linking the defendant to organized crime" and where obstruction of justice and violence are the organization's "normal course of business." *United States v. Krout*, 66 F.3d 1420, 1427 & n. 7 (5th Cir. 1995).

Here, the use of an anonymous jury was not justified by the *Ross* factors, and therefore, Mr. Touray's constitutional right to the presumption of innocence was violated by the district court's procedure. The court's reasoning for empaneling and anonymous jury was (1) allegations of "organized criminal activity where the juror might think that if the allegations are true, that there might be other unindicted or other co-conspirators who might be in a position to contact them if their identities were known;" and (2) the fact that there were weapons charges, which, according to the court, might make jurors "think there might be some threat to their personal safety." (Doc. 404 at 171). Neither of these reasons, even combined, is sufficient to burden Mr. Touray's constitutional rights.

First, the "organized criminal activity" here is not of the kind contemplated by this Court's precedent. Here, the "organized criminal activity" alleged was that Mr. Touray led a marijuana distribution conspiracy that shipped drugs between California and Atlanta. There was no evidence or suggestion that the people associated with Mr. Touray had a history of violence, obstruction of justice, or interfering with any judicial proceedings. *See Ochoa-Vasquez*, 428 F.3d at 1034-35.

In cases where this Court has upheld this procedure, the defendant was associated with a defined group, like a gang, or a major international organization. *See United States v. LaFond*, 783 F.3d 1216, 1223 (11th Cir. 2015) (defendants were members of "racist gangs"); *Ochoa-Vasquez*, 428 F.3d at 1034-35; *Bowman*, 302 F.3d at 1238–39; *Ross*, 33 F.3d at 1510 (defendant was the head of a "major international drug organization" known as the "West End Gang"). There is no such evidence or allegation here. The allegations and evidence in this case thus did not create "a strong reason to believe the jury need[ed] protection." *Ochao-Vasquez*, 428 F.3d at 1034.

Instead, the allegations here are similar to those in almost any other drug conspiracy case. There are almost always weapons involved in drug conspiracies, and there are almost always co-conspirators that are not on trial

with the defendant. *See United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) ("this Court has long recognized that . . . drugs and guns go together like peas and carrots"). Thus, the district court's reasoning in this case applies to almost every drug conspiracy case that goes to trial. This flies in the face of this Court's precedent holding that the "drastic measure" of an anonymous jury should be used only "in limited and carefully delineated circumstances." *Ross*, 33 F.3d at 1519.

Likewise, the court's explanation that it used an anonymous jury simply because there were gun charges here does not reflect the kind of particularized inquiry required by both this Court's caselaw and by statute. In *Ochoa-Vasquez*, this Court cited 28 U.S.C. 28 § 1863(b)(7) as the statutory authority to empanel an anonymous jury. 428 F.3d at 1033 n.24. Section 1863(b)(7) allows for this procedure when "the interests of justice so require," and the Supreme Court has stated that the "interests of justice" standard "contemplates a peculiarly context-specific inquiry." *Martel v. Clair*, 565 U.S. 648, 663 (2012). The district court's explanation here—essentially that any drug conspiracy or firearms case justifies the burdening of the defendant's constitutional rights—clearly does not demonstrate the sort of "peculiarly context-specific inquiry" required.

Furthermore, in erroneously empaneling an anonymous jury, the court failed to take any "precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights [were] protected." *Ochoa-Vasquez*, 428 F.3d at 1034. The court gave the jurors no explanation for hiding their identities. *See* Ross, 33 F.3d at 1520 (the district court may minimize the prejudicial effect if it "gives the jurors a plausible and nonprejudicial reason for hiding their identities."). This left the jury with the impression that Mr. Touray was "a dangerous person from whom the jurors must be protected," in violation of his constitutional right to the presumption of innocence. *Id.* at 1519.

The constitutional violation here requires reversal. The Fifth Circuit has held that, where the use of an anonymous jury is not justified under the applicable factors, "the defendant has essentially compromised his right, [and] he should receive a verdict, not from anonymous decisionmakers, but from people he can name as responsible for their actions." *United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir. 2016). Thus, while a harmless error analysis may be appropriate in "closer cases on the merits," where, as here, there were no factors justifying the empanelment of an anonymous jury, "[t]he conviction must be reversed and remanded for retrial." *Id.* Mr.

Touray submits that he Fifth Circuit is correct in this analysis, and reversal is required here without a harmless error analysis.

Moreover, a harmless error analysis is inappropriate here because the harm to Mr. Touray from this error is not quantifiable. In situations such as this, where a constitutional error "affect[ed] the framework within which the trial proceed[ed], and [was] not simply an error in the trial process itself," prejudice is presumed. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (applying a presumption of prejudice to a choice-of-counsel claim because "[i]t is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings"). Because the court's error was not an error within the trial, such as an evidentiary error or an error in jury instructions, but one affecting the structure of the trial, harmless-error analysis "would be a speculative inquiry." *Id.* at 150. As such, this Court must reverse Mr. Touray's jury convictions and remand for a new trial.

II. The district court erred by refusing to give Mr. Touray's multiple conspiracies instruction because there was at least slight evidence supporting the defense theory that instead of the single charged conspiracy, more than conspiracy existed.

"While a district court judge is vested with broad discretion in formulating his charge to the jury so long as it accurately reflects the law and

31

the facts, a defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Palma*, 511 F.3d 1311, 1315 (11th Cir. 2008) (cleaned up) (abrogated on other grounds by *Rehaif v. United States*, 588 U.S. ––––, 139 S. Ct. 2191, 2195–97 (2019)). In determining whether there is a proper evidentiary foundation for the instruction, the evidence must be viewed in the light most favorable to the accused. *United States v. Williams,* 728 F.2d 1402, 1404 (11th Cir. 1984).

The failure to give a requested jury instruction for which there is any foundation is reversible error if "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001).

Generally, a multiple conspiracy instruction is required where "the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the

overall conspiracy charged in the indictment." *United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008).

Here, the government charged one conspiracy that involved shipping marijuana from California to Atlanta and moving cash proceeds back to California. However, there was evidence supporting at least two other conspiracies that were separate from the overarching conspiracy alleged. First, Mr. Touray's testimony established a marijuana distribution conspiracy solely in California. (Doc. 351 at 30; Doc. 352 at 90 (Mr. Touray ran a marijuana business in California because it was legal under state law)).

There was also evidence that Mr. Touray was involved in a separate conspiracy with Sidibe and Mr. Touray's relatives living in the Atlanta house. Specifically, the government presented evidence that Mr. Touray connected Sidibe with relatives who could sell him marijuana from the Atlanta house. But this conspiracy involving Sidibe buying marijuana from Mr. Touray's relatives did not necessarily involve Mr. Touray shipping any marijuana from California to Atlanta, which was the conspiracy alleged by the government.

Thus, there was a foundation in the evidence for the proposed multiple conspiracies instruction, even if the district court viewed the evidence as

"weak, insufficient, inconsistent, or of doubtful credibility." *Palma*, 511 F.3d at 1315. The district court refused Mr. Touray's request, though, because the court found the instruction to be "confusing" and not "adjusted to the evidence." (Doc. 409 at 65-66). This reasoning is unavailing. First, the multiple conspiracies instruction was adjusted to the evidence because it was supported by the trial testimony, as discussed above. Second, even if the district court found the overall defense theory instruction confusing, the portion with the multiple conspiracies instruction could not have been confusing to the jury because it is this Circuit's pattern jury instruction. *See* 11th Cir. Pattern Jury Instructions O13.3. Thus, the Court should have given at least the multiple conspiracies instruction, which is what Mr. Touray argued for during the charge conference. (Doc. 409 at 60 (specifically requesting the instruction on multiple conspiracies)).

Furthermore, because the requested instruction was this Court's pattern, it was also a correct statement of the law. *See Fulford*, 267 F.3d at 1245. The multiple conspiracy issue was not covered by the general conspiracy instruction, as that instruction did not include any language about several conspiracies versus the single charged conspiracy. (*See* doc. 329 at 203; doc. 409 at 159). Moreover, the fact that this Court has a separate

pattern instruction for multiple conspiracies also indicates that the instruction is not covered by the general conspiracy instruction.

The failure to give this instruction was thus reversible error, as it also substantially impaired Mr. Touray's ability to present his defense. *See Fulford*, 267 F.3d at 1245. Mr. Touray argued to the jury that while he was not denying that he was involved in marijuana—including attempting to set up a business in California and helping Mr. Sidibe buy marijuana in Atlanta—there was "no agreement for this wholesale distribution of marijuana throughout the country." (Doc. 409 at 99). The defense was clearly that there were other conspiracies but that the government had not proven the single charged conspiracy. The court's refusal to give a jury instruction on multiple conspiracies thus impaired Mr. Touray's ability to present this defense.

Further, the jury's verdict strongly suggests that Mr. Touray was convicted based on the separate conspiracy with Mr. Sidibe and not the over-arching conspiracy involving the shipment of drugs and money between California and Atlanta that was alleged in the indictment, as it found that Mr. Touray was *not* responsible for more than 100 kilograms of marijuana. If the jury had found Mr. Touray guilty of the indicted conspiracy, it would

have found that there were more than 100 kilograms involved based on the money traveling from Atlanta to California, as the government argued in closing. (*See* doc. 409 at 71, 84-85 (arguing to the jury that it could arrive at a drug quantity of more than 100 kilograms by dividing the total amount of cash seized at airports by the price per pound of marijuana that Mr. Touray gave Sidibe)). Instead, the jury found him guilty only of a conspiracy involving less than 100 kilograms, which is consistent with a finding that he was guilty of a separate conspiracy that only involved Mr. Sidibe and Mr. Touray's relatives living at the Atlanta house.

The jury's verdict therefore confirms that Mr. Touray was prejudiced by the district court's refusal to give the requested instruction, because if properly instructed, the jury likely would have acquitted him entirely instead of convicting him of the lower quantity. Consequently, Mr. Touray's convictions resulting from the trial must be vacated.

III.  <u>The district court violated Mr. Touray's Fifth and Sixth Amendment rights when it based the drug quantity calculations on acquitted conduct.</u>

Thus far, five Supreme Court justices have acknowledged there are constitutional issues with permitting judicial fact-finding at sentencing to enhance a defendant's sentence beyond what is found by a jury. *See Jones v.*

*United States,* 547 U.S. 948 (2014) (denial of certiorari).  In dissent in *Jones*,

Justices Scalia, Thomas, and Ginsburg agreed that:

> The Sixth Amendment, together with the Fifth Amendment's Due Process Clause, "requires that each element of a crime" be either admitted by the defendant, or "proved to the jury beyond a reasonable doubt." Any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime, and "must be found by a jury, not a judge." We have held that a substantively unreasonable penalty is illegal and must be set aside.  It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It may not be found by a judge.
>
> . . .
>
> We should grant certiorari to put an end to the unbroken string of cases disregarding the Sixth Amendment—or to eliminate the Sixth Amendment difficulty by acknowledging that all sentences below the statutory maximum are substantively reasonable.

*Id. (internal citations omitted).* In *United States v. Sabillon-Umana*, 772 F.3d 1328,

1331 (10th Cir. 2014), then-Judge Gorsuch questioned the Constitutionality

of assuming that a district judge may either decrease or increase a

defendant's sentence (within the statutorily authorized range) based on facts

the judge finds without the aid of a jury or the defendant's consent.  He

noted, "[i]t is far from certain whether the Constitution allows" such action.

*Id.* at 1331.

In *United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015), then-Judge

Kavanaugh explained:

> Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial. If you have a right to have a jury find beyond a reasonable doubt the facts that make you guilty, and if you otherwise would receive, for example, a five-year sentence, why don't you have a right to have a jury find beyond a reasonable doubt the facts that increase that five-year sentence to, say, a 20-year sentence?

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) (denying *en banc* re-hearing)

(Kavanaugh, J., concurring) (internal citations omitted).  Judge Kavanaugh

noted his agreement with Judge Millett in the same opinion.  Judge Millett

fleshed out the argument this way:

> First, allowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee. . . . Accordingly, before depriving a defendant of liberty, the government must obtain permission from the defendant's fellow citizens, who must be persuaded themselves that the defendant committed each element of the charged crime beyond a reasonable doubt. That jury-trial right is "no mere procedural formality," but rather a "fundamental reservation of power in our constitutional structure."
>
> Yet as the law now stands, prosecutors can brush off the jury's judgment by persuading judges to use the very same facts the jury rejected at trial to multiply the duration of a defendant's loss of liberty threefold. In that regime, the jury is largely "relegated to making a determination that the defendant at some point did

> something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to punish" at sentencing.

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) (denying en banc re-hearing) (Millet, J., concurring) (internal citations omitted). Other judges have chimed in on the issue. *See, e.g., United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, B., J., dissenting) ("Reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the Sixth Amendment."); *United States v. Faust,* 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., specially concurring) ("I strongly believe . . . that sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment.").

The Michigan Supreme Court recently addressed this issue in connection with state sentencing guidelines. *See People v. Beck*, 504 Mich. 605 (2019). The *Beck* court held that, "Once acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." *Id.* at 609-10. On its way to this decision, the *Beck* court analyzed relevant case law, including federal case law. The court explained:

> A defendant is entitled to a presumption of innocence as to all charged conduct until proven guilty beyond a reasonable doubt,

and that presumption is supposed to do meaningful constitutional work as long as it applies. At least that's what we tell the accused and the jury about how it works. We can think of no reason that a jury's finding the defendant not guilty of a charge undoes that guarantee. In fact, the jury's view that the state did not meet its burden of proof should cut the other way.

Hypotheticals are helpful. Imagine a judge sending a defendant acquitted of *all* the charges against him to prison because the judge believed the evidence supported some punishment. Or a judge in a bench trial acquits a defendant of some charges but convicts of others and then punishes him as if he had been convicted of all the charges.

*Id.* at 621.

"Due process also requires adequate notice. A defendant sentenced for conduct the jury acquitted him of surely has a notice complaint." *Id*. citing *United States v Canania*, 532 F.3d 764, 777 (8th Cir. 2008) (Bright, J., concurring) (stating that the use of acquitted conduct at sentencing violates the due-process right to notice because "[i]t is not unreasonable for a defendant to expect that conduct underlying a charge of which he's been acquitted to play no determinative role in his sentencing").

Here, the jury convicted Mr. Touray of conspiracy to distribute less than 100 kilograms of marijuana. Yet, he was sentenced based on 190 kilograms of marijuana. The jury explicitly rejected the same theory that the district court based its drug quantity on—that the cash seized at airports

represented proceeds of the charged marijuana conspiracy. Thus, Mr. Touray has been sentenced based on acquitted conduct in violation of his Fifth and Sixth Amendment rights.

As discussed above, the jury's verdict indicates that it found that the conspiracy involved only the quantity of marijuana found in the Atlanta house, as the government's theory would have made him responsible for more than 100 kilograms. Using only the 55 kilograms found in the Atlanta house, Mr. Touray's base offense level would have been 18, rather than the base level of 24 found by the court. *See* U.S.S.G. § 2D1.1(c)(11). This would reduce his total guideline sentencing range by 6 points, resulting in an offense level of 28 and a guideline sentencing range of 78-97 months. Because Mr. Touray was sentenced to 120 months, the constitutional violation in sentencing based on acquitted conduct was not harmless beyond a reasonable doubt. As such, Mr. Touray's sentences must be vacated and the case remanded for resentencing based on a guideline range of 78-97 months.

IV.  The district erred by court imposing a sentence on Count 2 that was substantively unreasonable and procedurally erred by failing to adequately explain its chosen sentence.

A district court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), which include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public from the defendant's further crimes, and providing the defendant with appropriate correctional treatment. 18 U.S.C. § 3553(a). A district court must also take into consideration the "nature and circumstances" of the offense and the "history and characteristics" of the defendant. *Id.* § 3553(a)(1). In addition, the statute directs the district court to consider the types of sentences available, the applicable guideline range, any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *Id.* § 3553(a)(3)–(7).

A court abuses its discretion and imposes a substantively unreasonable sentence when it (1) fails to consider relevant factors that were due significant weight, (2) gives an improper or irrelevant factor significant weight, or (3) commits a clear error of judgment by balancing the proper

factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*)). While the weight accorded to any one § 3553(a) factor is a matter committed to the discretion of the trial court, "a district court's unjustified reliance on any one Section 3553(a) factor may be a symptom of an unreasonable sentence." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).

In reviewing the substantive reasonableness of a sentence imposed outside the guideline range, the Court "may take the degree of variance into account and consider the extent of a deviation from the guidelines." *Gall*, 552 U.S. at 47. A "major variance from the advisory guideline range requires a more significant justification than a minor one, and the justification must be sufficiently compelling to support the degree of the variance." *United States v. Taylor*, 997 F.3d 1348, 1355 (11th Cir. 2021). Finally, a sentence imposed well below the statutory maximum penalty is an indicator of a reasonable sentence. *Id.*

A sentence may be procedurally unreasonable where the district court "fails to explain the chosen sentence." *United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008). When a district court imposes a nonguideline sentence, it must "state in open court" the specific reason for the imposition of that

sentence. 18 U.S.C. § 3553(c)(2). "To satisfy § 3553(c)(2), the district court's reasons must be sufficiently specific so that an appellate court can engage in the meaningful review envisioned by the sentencing guidelines." *Parks*, 823 F.3d at 997. If a district court determines that a sentence outside the guidelines range is warranted, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50 (2007). "[A] major departure should be supported by a more significant justification than a minor one." *Id*. This is because, "even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 46.

Here, Mr. Touray was sentenced to 120 months on each conviction—illegal reentry, marijuana conspiracy, and the substantive marijuana offense—to run concurrently. Mr. Touray's guideline sentencing range for his *total* sentence, as calculated by the district court, was 151 to 188 months. *See* U.S.S.G. § 3D1.5 cmnt. ("This section refers the court to Chapter Five (Determining the Sentence) in order to determine the *total* punishment to be imposed based upon the combined offense level.") (emphasis added).

However, absent the grouping, Mr. Touray's guideline sentencing range for the illegal reentry count alone would have been only 0-6 months, based on an offense level of 8 and a criminal history category of I. *See* U.S.S.G. Ch. 5 Pt. A. Mr. Touray's sentence on Count 2 was thus 20 times what the guideline range would have been alone. The grouping rules in the Guidelines are meant to calculate the *total* sentence; not necessarily the sentence on each individual count. Where, as here, the grouping rules result in a guideline range for the total sentence that is far in excess of what the guidelines would be for an individual count, simply sentencing the defendant to concurrent terms based on the grouping guidelines results in a sentence that is greater than necessary on that specific count. *See* 18 U.S.C. § 3553(a). There is simply no reason that Mr. Touray should be sentenced to the maximum term, which was 20 times the guideline range, on this individual count. Mr. Touray's 120-month sentence on the illegal reentry count was therefore substantively unreasonable.

Furthermore, the court here gave no explanation for why a 120-month sentence on the illegal entry—the statutory maximum for the offense—was appropriate or warranted by the § 3553(a) factors. *See Gall*, 552 U.S. a 50 ("After settling on the appropriate sentence, [the court] must adequately

explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."); *Rita v. United States*, 551 U.S. 338, 356 (2007) ("A sentencing judge is required to set forth enough of an explanation to satisfy [the Court] that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority). In pronouncing the sentence, the court spoke only of the drug conspiracy, and did not mention the illegal reentry conviction. (*See* doc. 410 at 110-13). Therefore, the court also procedurally erred in imposing this sentence.

The court's error in sentencing Mr. Touray to 120 months on the illegal reentry counts is not harmless just because he was sentenced to concurrent terms of 120 months on the other counts. First, if Mr. Touray is successful in this appeal, his convictions and/or sentences on the drug counts could be vacated, but he could be left with 120 months to serve on the illegal reentry count because he pled guilty to that count.

Additionally, it is reasonably possible that the marijuana guidelines could be amended such that Mr. Touray's guideline sentencing range would be reduced, and such an amendment could apply retroactively to Mr.

Touray.[4] *C.f.* U.S.S.G. Amendment 821 (revising the Commentary to §4A1.3 (Departures Based on Inadequacy of Criminal History Category) to include sentences resulting from possession of marijuana offenses as an example of when a downward departure from the defendant's criminal history may be warranted); U.S.S.G. Amendments 706 and 713 (together retroactively reducing the base offense levels applicable to crack cocaine offenses). This also would leave Mr. Touray with a 120-month sentence to serve that was based on the marijuana guidelines due to the grouping rules, but would not be reduced pursuant to an amendment to those guidelines.

For these reasons, the court's error was not harmless, and this Court should vacate for the district court to impose a reasonable sentence on the illegal reentry count.

---

[4] In August, 2023, the Department of Health and Human Services formally recommended that the DEA reclassify marijuana from Schedule I to Schedule III. The Senate Majority Leader and numerous other senators have called for it to be removed from the Controlled Substances Act completely. *See* Democrats Urge Biden Administration to Deschedule Marijuana, NBC News (Jan. 30, 2024), available at https://www.nbcnews.com/politics/congress/democrats-urge-biden-administration-deschedule-marijuana-rcna136241 (last accessed February 1, 2024).

## CONCLUSION

For the reasons articulated above, this Court should vacate Mr. Touray's convictions from trial and all of his sentences, and remand for further proceedings.

Dated:  This 5th day of February, 2024.

Respectfully submitted,


*/s/ Sydney R. Strickland*
Sydney R. Strickland
Georgia Bar No. 418591


STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com

## CERTIFICATE OF COMPLIANCE

This brief contains 11,067 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief was filed by uploading it with the Eleventh Circuit's Electronic Filing System which will automatically serve opposing counsel with the Brief.

Dated:  This 5th day of February, 2024.

/s/ Sydney R. Strickland
Sydney R. Strickland
Georgia Bar No. 418591

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510 #203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile:  (404) 393-3617
sydney@stricklandwebster.com